## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **TIMOTHY J. BURCH,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| ) | **Case No. 07-3236** |
| **v.** ) | |
| ) | |
| **DON JORDAN, et al.,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

### MEMORANDUM AND ORDER

Plaintiff Timothy Burch, proceeding *pro se* and *in forma pauperis*, brings this action

against numerous defendants under 42 U.S.C. § 1983.  He is seeking monetary, declaratory and

injunctive relief based on alleged violations of his constitutional rights stemming from his

involuntary civil commitment and confinement pursuant to the Sexually Violent Predator Act,

K.S.A. § 59-29a01 *et seq.* ("KSVPA").  This matter comes before the Court on defendants'

Motions to Dismiss (Docs. 125 and 153).

As explained below, the Court concludes that the Eleventh Amendment bars the official

capacity claims to the extent plaintiff seeks money damages.  Further, with respect to the official

capacity claims for declaratory and injunctive relief and the individual capacity claims for

monetary, declaratory and injunctive relief, the First Amended Complaint fails to state a claim,

largely because, with respect to most of the claims, it fails to allege sufficient facts

demonstrating any or all defendants' personal participation.  Even for those claims that arguably

allege sufficient facts showing personal participation, the First Amended Complaint fails to state

a claim under § 1983, because it fails to allege facts that, if true, would constitute a violation of a

right secured by the Constitution or laws of the United States.  For the same reason, the First Amended Complaint fails to overcome the defendants' qualified immunity from liability on the individual capacity claims, for it does not allege facts showing conduct violative of a clearly established statutory or constitutional right.

I.      **Procedural Background/First Amended Complaint**

In 2002, plaintiff was found to be a "sexually violent predator" and was involuntarily committed pursuant to the KSVPA to the custody of the Secretary of the Department of Social and Rehabilitation Services ("SRS") in the Sexual Predator Treatment Program ("SPTP") at Larned State Hospital, in Larned, Kansas.  Plaintiff has been confined since June 5, 2002.  Plaintiff and other plaintiffs who are no longer parties to this action, filed this action in September 2007,  pursuant to 42 U.S.C. § 1983, alleging violations of their constitutional rights.  Plaintiff gained leave of Court and subsequently filed a First Amended Complaint (Doc. 122), which dropped some defendants and added others.  The defendants who were named in the original Complaint moved to dismiss (Doc. 125); plaintiff responded (Doc. 139); and defendants replied (Doc. 149).

At the time defendants moved to dismiss, service had not been effected on the defendants who were added to this action in the First Amended Complaint; but service was subsequently effected, and in a second motion to dismiss, these new defendants moved to dismiss, incorporating by reference the earlier motion to dismiss.  Plaintiff does not object to this, and the Court thus considers the parties' respective filings to now apply to the First Amended Complaint.

There were seven defendants who were named as party defendants in the original

Complaint but who are not named as party defendants in the First Amended Complaint: Mark E. Shutter, Leo Herman, Stacy Paige, Dennis Smith, Brooke Thompson, Cory Turner and Lance Hagerman. Plaintiff argues that he did not name these seven persons as defendants because they are no longer employed by Larned State Hospital, but that they are effectively still in the case through the employees who were hired to replace them and who are newly named as defendants in the First Amended Complaint: defendants Robert Connell, Lee Flamik, Matthew Brous and Penny Riedel. This argument is without merit. Defendants acknowledge that pursuant to Fed. R. Civ. P. 25(d), the new defendants should properly be treated as substituted parties on the official capacity claims with respect to the seven defendants who are no longer named in the First Amended Complaint. But there is no authority for plaintiff's position that he retains individual or official capacity claims against the seven defendants not named in the First Amended Complaint. There is no mention of these seven defendants in the caption of the First Amended Complaint, as Fed. R. Civ. P. 10(a) requires. Nor is there any mention of them in the body of the First Amended Complaint, such that there is no notice as to what claims are being made against these seven persons.[1] Accordingly, the Court dismisses defendants Shutter, Herman, Paige, Smith, Thompson, Turner and Hagerman from this action.

The First Amended Complaint also names John Doe and/or Jane Doe defendants, who plaintiff identifies as "any individual people employed by the Department of Social and Rehabilitation Services. Who was [sic] acting under the COLOR OF STATE LAW, while working at the Kansas Sexual Predator Treatment Program, an agency or entity, including, but

---

[1] *See Mitchell v. Maynard*, 80 F.3d 1433, 1441 (10th Cir. 1996) (a party not named in the caption may be properly before the court if the allegations in the body of the complaint make it plain the party is intended to be a defendant).

not limited to, all Counselors, Treatment Team, Clinical Team, Supervisory Team, Clinical Psychologist and/or Psychiatrists who aid, abet, and are responsible for carrying out all SPTP policies, practices and procedures and for the care, custody and treatment of the plaintiff. Each defendant had directly or indirectly participated in the deprivation of Plaintiff's constitutional rights as alleged herein."[2] Although plaintiff may generally plead claims against unknown defendants, he must "provide [] an adequate description of some kind which is sufficient to identify the person involved so process eventually can be served."[3] Here, the First Amended Complaint does not allege with any specificity which claims involve the John or Jane Doe defendants or what roles those unknown individuals might have played in this matter. Indeed, plaintiff effectively names any and every person he has come into contact with during his confinement in the SPTP. Plaintiff gives no factual basis upon which to demonstrate the personal involvement of any other defendants, and the First Amended Complaint appears insufficient to allow eventual identification of any alleged John and Jane Doe defendants. Because all other claims against the defendants are dismissed below, the Court dismisses these defendants for failure to state a claim as well.

The defendants addressed in this Memorandum and Order are thus: Don Jordan, Secretary of the Kansas Department of SRS; Dr. Robert E. Connell, Superintendent of Larned State Hospital for the Kansas Department of SRS; Dr. Austin T. DesLauriers, Program Clinical Director for SPTP; Lee Flamik, Program Administrative Director for SPTP; Dr. Mayda Nel Strong, Supervising Psychologist for SPTP; Keri Applequist, Primary Therapist for SPTP;

---

[2](Doc. 122 at 10.)

[3]*Fisher v. Okla. Dep't of Corr. Unknown State Actor and/or Actors*, 213 F. App'x 704, 708 n.2 (10th Cir. 2007) (quoting *Roper v. Grayson*, 81 F.3d 124, 126 (10th Cir. 1996)).

Sandra Gray, Clinical Social Worker Supervisor for SPTP; Matthew Brous, Program Consultant

for SPTP; and Penny Riedel, Activity Therapist II for SPTP.  These defendants are all sued in

their official and individual capacities and are alleged to have acted under color of state law.

## II.     Legal Standards

### A.     Section 1915(e)

By the terms of 28 U.S.C. § 1915(e)(2)(B)(ii), plaintiff's First Amended Complaint

(hereinafter "the Complaint") must be reviewed and, if found to be frivolous or malicious or to

not state a claim on which relief may be granted, then the court must dismiss the case.  It is well-

established that:

> Dismissal of a pro se complaint for failure to state a claim is proper
> only where it is obvious that the plaintiff cannot prevail on the
> facts he has alleged and it would be futile to give him an
> opportunity to amend.  In determining whether dismissal is proper,
> we must accept the allegations of the complaint as true and
> construe those allegations, and any reasonable inference that might
> be drawn from them, in the light most favorable to the plaintiff.  In
> addition, we must construe a pro se applicant's complaint
> liberally.[4]

28 U.S.C. § 1915 applies to actions, such as this, that are filed *in forma pauperis*.  Subsection

(e)(2)(B) provides for dismissal of such actions if the court determines that "the action or appeal

(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii)

seeks monetary relief against a defendant who is immune from such relief."[5]  The court may not

dismiss an *in forma pauperis* complaint "simply because the court finds the plaintiff's

---

[4]*Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002) (internal quotation marks and citations omitted).

[5]28 U.S.C. § 1915(e)(2)(B).

allegations unlikely."[6]  Section 1915(e)(2)(B) allows a district court to dismiss a complaint "at

any time," and there is no requirement under the statute that the court must first provide notice or

an opportunity to respond.[7]  Although plaintiff is no longer a prisoner, courts have held that the

screening procedure set out in § 1915(e)(2) applies to all litigants proceeding *in forma pauperis*.[8]

## B.    Section 1983

Pursuant to 42 U.S.C. § 1983, plaintiff's Complaint asserts claims for violations of his

First, Fourth, Sixth, Eighth, and Fourteenth Amendment rights.  Plaintiff states that he is not

challenging his involuntary commitment or the constitutionality of the KSVPA.[9]  Rather, he

challenges the conditions of his confinement: the treatment provided, the "punishment"

administered, and "the overly restrictive conditions" of his confinement.  He asserts three

general claims: (1) failure to provide the best available and most qualified treatment in violation

of the Fourteenth Amendment, § 1 of the Kansas Bill of Rights, and K.S.A. § 59-29a09; (2)

deprivation of liberty, speech and property rights in violation of the Due Process Clause of the

Fourteenth Amendment and § 1 of the Kansas Bill of Rights; and (3) deprivation of the right to

legal materials and access to the courts in violation of the Sixth Amendment and § 10 of the

Kansas Bill of Rights.  Plaintiff requests relief in the following forms: declaratory and injunctive

relief; compensatory and punitive damages; costs and attorneys' fees; the best available and most

---

[6]*Denton v. Hernandez*, 504 U.S. 25, 33 (1992).

[7]*See Jones v. Barry*, 33 F. App'x 967, 971, 2002 WL 725431, at *2 (10th Cir. Apr. 25, 2002).

[8]*See Alexander v. Wichita Hous. Auth.*, Case No. 07-1149-JTM, 2007 WL 2316902, at *2 (D. Kan. Aug. 9, 2007) (citations omitted).

[9]The United States Supreme Court upheld the constitutionality of the KSVPA in *Kansas v. Hendricks*, 521 U.S. 346 (1997), holding that the Act met substantive due process requirements and was civil rather than criminal in nature.  *Id.* at 368–69, 371; *Kansas v. Crane*, 534 U.S. 407, 409 (2002).

qualified treatment; due process, including notice of the offense and the relevant regulation, and a hearing prior to "punishment"; conditions of confinement that are not overly restrictive; and an order enjoining defendants from punishing him without due process, from confining him under excessively restrictive conditions, or from taking his approved personal possessions.

"Section 1983 does not create any substantive rights, but provides a recovery for the deprivation of federal rights."[10]  The statute "imposes liability for violations of rights protected by the constitution or laws of the United States, not for violations of duties of care arising out of tort law."[11]  "To state a claim under § 1983, a plaintiff [1] must allege the violation of a right secured by the Constitution and laws of the United States, and [2] must show that the alleged deprivation was committed by a person acting under color of state law."[12]  Furthermore, plaintiff must allege a violation of his own rights, and not the rights of someone else.[13]

### C.  Rule 12(b)(6)

Defendants move to dismiss the official and individual capacity claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted and because they are entitled to qualified immunity.  To survive a motion to dismiss, a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and must contain "enough facts to state a claim to relief that is plausible on its face."[14]  Under this standard, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable

---

[10]*Scothorn v. State of Kan.*, 772 F. Supp. 556, 560 (D. Kan. 1991).

[11]*Archuleta v. McShan*, 897 F.2d 495, 496 (10th Cir. 1990).

[12]*West v. Atkins*, 487 U.S. 42, 48 (1988).

[13]*Archuleta*, 897 F.2d at 497.

[14]*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

likelihood of mustering factual support for *these* claims."[15]  The plausibility standard does not require a showing of probability that "a defendant has acted unlawfully,"[16] but requires more than "a sheer possibility."[17]

The plausibility standard enunciated in *Bell Atlantic Corp. v. Twombly*[18] seeks a middle ground between heightened fact pleading and "allowing complaints that are no more than 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action,' which the Court stated 'will not do.'"[19]  *Twombly* does not change other principles, such as that a court must accept all factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven.[20]

The Supreme Court has explained the analysis as a two-step process.  For the purposes of a motion to dismiss, the court "must take all the factual allegations in the complaint as true, [but] we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"[21]  Thus, the court must first determine if the allegations are factual and entitled to an assumption of truth, or merely legal conclusions that are not entitled to an assumption of truth.[22]  Second, the court must determine whether the factual allegations, when assumed true, "plausibly give rise to an

---

[15]*Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in the original).

[16]*Ashcroft v. Iqbal*, – U.S. –, 129 S. Ct. 1937, 1949 (2009).

[17]*Id.*

[18]550 U.S. 544 (2007).

[19]*Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 555).

[20]*Id.* (citing *Twombly*, 550 U.S. at 556).

[21]*Iqbal*, – U.S. –, 129 S. Ct. at 1949–50.

[22]*Id.* at 1950.

entitlement to relief."[23]  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[24]

If the court on a Rule 12(b)(6) motion looks to matters outside the complaint, the court generally must convert the motion to a Rule 56 motion for summary judgment.  However, the court may consider documents which are referred to in the complaint and are central to plaintiff's claims if their authenticity is not in dispute.[25]

Because plaintiff pursues his action *pro se*, the Court must remain mindful of additional considerations.  A *pro se* litigant's pleadings are to be construed liberally and held to a less stringent standard than pleadings drafted by lawyers.[26]  Thus, if a *pro se* plaintiff's complaint can reasonably be read "to state a valid claim on which the plaintiff could prevail, [the court] should do so despite the plaintiff's failure to cite proper legal authority, his confusion of various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements."[27]  However, it is not "the proper function of the district court to assume the role of advocate for the *pro se* litigant."[28]  For that reason, the court should not "construct arguments or theories for the plaintiff in the absence of any discussion of those issues,"[29] nor should it

---

[23]*Id.*

[24]*Id.* at 1949.

[25]*See GFF Corp. v. Associated Wholesale Grocers,* 130 F.3d 1381, 1384–85 (10th Cir. 1997).

[26]*Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991) (citing *Haines v. Kerner*, 404 U.S. 519, 520–21 1972)).

[27]*Id.*

[28]*Id.*

[29]*Drake v. City of Fort Collins*, 927 F.2d 1156, 1159 (10th Cir. 1991).

"supply additional factual allegations to round out a plaintiff's complaint or construct a legal theory on plaintiff's behalf."[30]

## III.     Discussion

With the above standards in mind, the Court turns to an analysis of the sufficiency of the many averments and allegations in the Complaint.

### A.     Official Capacity Claims

The Complaint includes claims for monetary relief against the defendants in their official capacity as State officials.  These claims fail for lack of jurisdiction.[31]  Under Fed. R. Civ. P. 12(b)(1), district courts have "original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States."[32]  "A case arises under federal law if its 'well pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'"[33]  Plaintiff is responsible for showing the court by a preponderance of the evidence that jurisdiction is proper.[34]  Mere allegations of jurisdiction are not enough.[35]

A suit against a State official in his official capacity is equivalent to a suit against the

---

[30]*Whitney v. State of N.M.*, 113 F.3d 1170, 1173–74 (10th Cir. 1997).

[31]*See* 28 U.S.C. § 1915(e)(2)(B) (providing for dismissal if *pro se* plaintiff proceeding *in forma pauperis* seeks monetary relief against a defendant who is immune from such relief).

[32]28 U.S.C. § 1331.

[33]*Nicodemus v. Union Pac. Corp.*, 440 F.3d 1227, 1232 (10th Cir. 2006) (quoting *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 27-28 (1983)).

[34]*United States ex rel. Stone v. Rockwell Int'l Corp.*, 282 F.3d 787, 797 (10th Cir. 2002).

[35]*Id.* at 798.

entity that he represents.[36]  Therefore, claims against State defendants in their official capacity, whereby plaintiff seeks monetary relief, are barred by the Eleventh Amendment.[37]  Moreover, State officials acting in their official capacity are not "persons" against whom suit may be brought under § 1983.[38]

To the extent plaintiff has sued defendants in their official capacity for prospective injunctive relief, those claims are not implicated by the Eleventh Amendment.[39]  However, as discussed in the sections that follow, the Court concludes that the official capacity claims for declaratory and injunctive relief fail because the Complaint fails to allege facts stating that defendant(s) violated plaintiff's rights.  To create liability under § 1983 against a defendant in his official capacity, plaintiff must allege facts showing "(1) that a constitutional violation occurred and (2) that some official policy or custom was the moving force behind the violation."[40]  "However, liability will not attach 'where there was no underlying constitutional violation by any of [the officials].'"[41]  Without sufficient allegations of a constitutional violation, plaintiff cannot provide the nexus required for official-capacity liability under § 1983.[42]

---

[36]*Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[37]*Id.* at 169.

[38]*Will v. Mich. Dep't of State Police*, 491 U.S. 58, 70–71 (1989).

[39]*See id.* at 71 n.10.

[40]*Stevenson v. Whetsel*, 52 F. App'x 444, 446 (10th Cir. 2002) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 820 (1985)).

[41]*Ellis v. Ogden City*, 589 F.3d 1099, 1104–05 (10th Cir. 2009) (quoting *Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006); citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

[42]*Id.* at 1105; *see also Calderon v. Kan. Dep't of Social & Rehabilitation Servs.*, 181 F.3d 1180, 1185 (10th Cir. 1999) (noting that official-capacity claim for injunctive relief required allegations rising to the level of a constitutional violation).

Therefore, the official capacity claims for declaratory and injunctive relief also fail, for as further explained below, the Complaint fails to show a violation of constitutional or federal rights.

## B.    Individual Capacity Claims

### 1.    Personal Participation

"In order for liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established."[43]  When a claim is asserted against multiple defendants, plaintiff must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her."[44]  The Tenth Circuit has held that, "[g]iven the complaint's use of either the collective term 'Defendants' or a list of the defendants named individually but with no distinction as to what acts are attributable to whom, it is impossible for any of these individuals to ascertain what particular unconstitutional acts they are alleged to have committed."[45]

Furthermore, liability cannot be imposed vicariously via the doctrine of *respondeat superior*.[46]  The Tenth Circuit has explained that, when asserting a claim against a supervisor, plaintiff must demonstrate "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged

---

[43]*Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006).

[44]*Smith v. United States*, 561 F.3d 1090, 1104 (10th Cir. 2009) (emphasis in original) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008)).

[45]*Robbins*, 519 F.3d at 1250.

[46]*Trujillo*, 465 F.3d at 1228.

12

constitutional deprivation."[47]

In this respect, the Complaint fails to state a claim against most of the defendants with respect to most of the claims. Reading the Complaint in its entirety, the Court concludes that other than various conclusory statements, and other than certain specific allegations addressed below, the Complaint fails to state with the requisite specificity what a particular defendant did to plaintiff, thus denying these defendants the right to fair notice as to the basis of the claims against each of them.

Specifically, "Section IV. Parties" of the Complaint individually identifies the defendants' job titles and responsibilities, but fails to state *what* they did. Instead, the Complaint states in conclusory fashion that these defendants were: (1) either members of the "Treatment Team, Clinical Team and Leadership Team," or had either "supervisory authority and responsibility" or "administrative authority and responsibility," or exercised supervision of personnel concerning administration and operations; and (2) were involved in either the approval, promotion, direction and/or implementation of practices, policies and procedures concerning training, care and treatment, and/or "directly participated" in or knew or should have known about other personnel who were responsible for the deprivation of plaintiff's rights. But this section of the Complaint provides no further specifics.

"Section V. Factual Allegation" supplies additional detail, but in most instances fails to sufficiently specify what a particular defendant did. Under a subsection entitled, " D. Care and Treatment," the Complaint fails to allege with any specificity what any particular defendant did in denying plaintiff care and treatment. Instead, the Complaint broadly and unspecifically avers

---

[47]*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010).

that these defendants have: not provided plaintiff "with adequate treatment that will give him a realistic opportunity to meet the statutory requirements to be released from confinement"; "not clinically diagnosed what 'mental abnormality or personality disorder' plaintiff suffers"; "not developed a specific or appropriate treatment plan" nor a "workable individualized treatment plan"; not provided plaintiff with "treatment by a psychiatrist or licensed clinical psychologists trained, qualified, certified or licensed to provide meaningful treatment to 'sexually violent predators'"; and not given plaintiff credit for the treatment he received while incarcerated.

The only averments specific to any defendants are directed at defendants Brous, DesLauriers and Strong.  Dr. Brous, who is alleged to be plaintiff's "primary therapist,"[48] has an office in a different building, and "has never been seen by plaintiff on his own living unit."  The Complaint alleges that plaintiff thus cannot talk to defendant Brous, "most of the time," and that Brous thus has a "neglectful rapport" with plaintiff.  The Complaint also alleges that plaintiff cannot talk with defendants Dr. DesLauriers and Dr. Strong because their offices are not on plaintiff's living unit, they spend less than thirty minutes per year on the living unit, and "because of their current case load."  The Complaint also alleges that defendants DesLauriers, Strong and Applequist "have acknowledged that plaintiff should receive credit for prior treatment experience, but have failed in light of his repeated request to do so."  The Court concludes that taking these allegations as true, these averments do not sufficiently allege and distinguish the personal participation by these defendants.

Under subsections entitled "E. Punishment," "F. Resident Disciplinary Reports," "F.

_____

[48]Another section of the Complaint alleges that defendant Applequist is plaintiff's primary therapist.

Telephone System,"[49] "G. Grand Fathered Items," "H. Censorship," "I. Conditions of Confinement," "J. Educational Services," "K. Law Library," "L. Excessively Restrictive Practices and Policies," and "M. Denial of Meaningful Employment," of "Section V. Factual Allegation" of the Complaint, there are still more generic, unspecific and conclusory allegations. The subsection entitled "E. Punishment" alleges that defendants "unconstitutionally punished" plaintiff, out of "retaliation or retribution for his efforts to exercise his constitutional rights," and "without providing him any of the constitutionally required due process to which he is entitled." There are no specific allegations about which defendants did what. By listing defendants collectively without distinction as to who did what, the Complaint fails to give notice "as to what acts are attributable to whom" in this claim.[50] Where the Complaint fails to articulate specific times, places, or persons involved in the alleged misconduct, it gives "defendant[s] seeking to respond to plaintiff['s] conclusory allegations . . . little idea where to begin."[51]

Similarly, the subsection entitled "F. Resident Disciplinary Reports" merely alleges that the defendants all "established a policy of punishing plaintiff and other SPTP residents for alleged or perceived violations of conduct or another misbehavior by imposing on them 'Resident Disciplinary Reports'"; and that none of the defendants ever advised plaintiff of the reasons for his punishment, nor gave him notice or an opportunity to be heard. Again, there are no specific allegations about which defendants did what or failed to do what.

Nor are there any allegations whatsoever as to which defendants did what in the

---

[49] There are two subsections enumerated "F" in the Complaint.

[50] *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008).

[51] *Bridges v. Lane*, 351 F. App'x 284, 286 (10th Cir. 2009) (quoting *Robbins*, 519 F.3d at 1248).

subsection entitled "G. Grand Fathered Items."  In this subsection, the Complaint alleges that

certain property was seized and withheld from plaintiff for over a month.  Yet the Complaint

fails to mention any of the defendants by name, much less allege what, if any, involvement they

had in the seizure of plaintiff's property.

In the subsection entitled "I. Conditions of Confinement," the Complaint alleges that

defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel are responsible for

conditions of confinement, created a policy that resulted in plaintiff being moved to a different

building when his security level was reduced, engaged in unequal enforcement of rules for the

purpose of harassing, intimidating and embarrassing plaintiff, and refused to provide plaintiff

and other residents with copies of policies.  The Complaint also alleges that these same

defendants have threatened to "write up" plaintiff anytime he was perceived to be

confrontational or challenging their authority.  But the Complaint fails to allege sufficient detail

to put these defendants on notice of who did what and to whom.  In this section of the

Complaint, plaintiff alleges not only that these defendants engaged in conduct directed at him,

but in conduct directed at others.  These defendants have absolutely no notice as to which

defendant did what, and to whom.   In this same subsection, the Complaint also alleges that these

defendants "have repeatedly and persistently operated the program at Larned and Osawatomie

State Hospitals in an illegal, fraudulent and a deceptive manned and thus have threatened the

health, safety, and welfare of the plaintiff and other similarly situated residents. . . ."  This broad

and conclusory statement again fails to allege sufficient facts demonstrating personal

participation by anyone.

Similarly, in the subsection entitled "K. Law Library," the Complaint alleges that the

"defendants have not permitted Mr. Burch meaningful access to a law library," because the legal materials are inadequate and the library is not staffed by anyone knowledgeable about the collection and the upkeep of the collection. Other than alleging that the defendants have an obligation to provide meaningful access to legal resources and materials, no mention is made of the defendants. There are no specific allegations about which defendants did what or failed to do what.

And, in the subsection entitled "L. Excessively Restrictive Practices and Policies," the Complaint alleges that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have "jointly" established, written, adopted, enforced, maintained, developed or imposed policies and procedures that are "unusually excessive and restrictive." The complained of policies and practices relate to access to personal property including a computer; restricting magazines and newspapers; a weight limit on items he can purchase from an in-house store; denying access to a flight training correspondence course; terminating his vocational training position and denying other meaningful employment opportunities; seizing property; restricting phone calls; not testing or considering prior treatment plaintiff received; not answering grievances in a meaningful and timely fashion; denying access to a washer and dryer; and monitoring plaintiff's "every action and conversation." But there are no specific allegations regarding the personal participation of any of the defendants. There are no specific allegations showing that other than "jointly establishing, enforcing or imposing the policies," any one or more of these  defendants acted deliberately or intentionally to violate plaintiff's constitutional or federal rights with regard to these various complaints.

"Individual liability under § 1983 must be based on personal involvement in the alleged

constitutional violation."[52]  After *Ashcroft v. Iqbal*,[53] the Tenth Circuit has held that, to state a claim for liability against a defendant-supervisor, plaintiff must allege that "(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation."[54]  Even under pre-*Iqbal* standards, this meant that plaintiff had to allege "a deliberate, intentional act by the supervisor to violate constitutional rights," which was present if "the defendant-supervisor personally directed the violation or had actual knowledge of the violation and acquiesced in its continuance."[55]  Plaintiff had to allege an "affirmative link" between "the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise," so as to establish causation.[56]

There are other averments in the Complaint that go beyond alleging that certain defendants had responsibility for certain policies, practices or procedures.  The Complaint alleges that plaintiff complained to certain defendants about allegedly violative conduct and that these defendants failed to act or respond.  Although in most instances the Complaint provides insufficient or barely sufficient allegations in that regard, the Court assumes that the Complaint adequately pleads personal participation and proceeds to further analyze these claims under later

---

[52]*Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008).

[53]—U.S.—, 129 S. Ct. 1937 (2009).

[54]*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (citation omitted).

[55]*Jenkins v. Wood*, 81 F.3d 988, 994–95 (10th Cir. 1996).

[56]*Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Green v. Branson*, 108 F.3d 1296, 1302 (10th Cir. 1997)); *see also Dodds*, 614 F.3d at 1201 n.9; *Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1156–57 (10th Cir. 2001).

sections of this Memorandum and Order.  Thus, the Court assumes that the Complaint sufficiently alleges the personal participation of defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel in the subsection entitled "F. Telephone System."  In a conclusory fashion that fails to distinguish each defendant's personal participation, the Complaint alleges that these defendants "have made it impossible to have confidential phone calls," in the aftermath of changing the telephone system.  Previously there were phones available from which residents could place and receive calls.  After the change, two phones were dedicated to incoming calls; and two pay phones were installed for outgoing calls.  The phones have short cords and audibility is impaired by their placement next to an air vent.  But the Complaint does allege that plaintiff complained to each of these defendants and that they failed to respond to his complaints.  Thus, the Court will proceed to analyze whether the Complaint otherwise sufficiently states a claim with respect to the averments concerning the telephone system in later sections of this Memorandum and Order.

Similarly, in the subsection "G. Criminogenics Needs Assessment," the Complaint alleges that the criminogenics needs assessment tool used by the therapeutic and nursing staff is counterproductive to treatment and disfavored by therapy and nursing staff, but has been used against plaintiff in a punitive and retaliatory fashion.  The Complaint alleges that defendants DesLauriers, Strong, Applequist, Gray and Riedel failed to respond to plaintiff's complaints that nursing staff have admittedly given him low scores because of their animosity toward plaintiff, and that staff who have had insufficient contact with plaintiff have nonetheless participated in assessing his criminogenics score.  The Complaint further alleges that defendants Applequist, Gray and Riedel have themselves "purposefully and maliciously scored [plaintiff] on the

criminogenics," and that defendant Applequist conspired with nursing staff to assess scores so low that plaintiff's security level was reduced, and did so based on an assessment period of less than the 90 day period required by the hospital's policy. In this subsection of the Complaint, plaintiff provides far more detail than in the other subsections, including dates of administrative actions and certain communications concerning his scores and his reduction in security level. Although many of his allegations sound conclusory, such as "purposefully and maliciously scored" him low, and "conspired," to give him low scores, the Court will nonetheless proceed to analyze whether the Complaint otherwise sufficiently states a claim with respect to the averments concerning the criminogenics scores.

Likewise, the Court will proceed to analyze the claims in subsection "H. Censorship," that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel took no action in response to plaintiff's complaints that his constitutional rights were violated by censoring and precluding him from possessing a JC Penney catalog and a movie entitled "Luster," and precluding him from buying the local newspapers. The Court will also proceed to analyze the claims in subsection "M. Denial of Meaningful Employment" that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel "refused or failed to take any action" in response to plaintiff's complaints about losing his vocational position when he was moved to another residential building after he received a security level reduction in the aftermath of receiving two disciplinary reports. Plaintiff reapplied for a vocational position, but was denied.

Finally, the Court will proceed to analyze the allegation in subsection "J. Educational Services," that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel, by seizing his computer, effectively denied him the educational opportunity to take a correspondence

course in flight training. Although it is unlikely that all of these defendants, together, seized the computer, taking this allegation as true, the Court concludes that the Complaint alleges specific and sufficient allegations of personal participation by defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel that they seized plaintiff's computer and thus denied him the opportunity to take the correspondence course. Other allegations in this subsection, "J. Educational Services," however, fail to show personal participation by these defendants with the requisite specificity. The Complaint alleges that defendants are deliberately indifferent to the rights and needs of people with learning disabilities, such as plaintiff, who allegedly has dyslexia. The Complaint alleges that all named defendants have failed to provide special education teachers and services, and instead employ therapists who lack special training in teaching the learning disabled. These allegations are broad, sweeping, and fail for not showing any defendant's personal participation.

Thus, the Court concludes that with few exceptions, the Complaint fails to state a claim against these defendants, based on plaintiff's failure to allege sufficient facts that demonstrate the defendants' personal participation. The Court concludes that the Complaint is insufficiently specific with regard to the various allegations that plaintiff complained to all or some of the defendants, without response. Nonetheless, the Court proceeds to analyze those particular claims to determine whether the Complaint otherwise fails to state a claim with respect to these claims:

(1) defendants Brous, DesLauriers and Strong have failed to provide care and treatment by failing to have sufficient contact with plaintiff;

(2) defendants DesLauriers, Strong and Applequist have failed to provide care

and treatment by failing to give plaintiff credit for his prior treatment experience despite acknowledging that plaintiff should receive such credit;

(3) defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about the phone system impairing his ability to make and receive private phone calls;

(4) defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about denial of meaningful employment;

(5) defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about censorship of materials;

(6) defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel, have failed to respond to plaintiff's complaints about the inadequacy of the library;

(7) defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel, seized plaintiff's computer and thus denied him the opportunity to take the correspondence course; and

(8) defendants Applequist, Gray and Riedel have wrongfully assessed plaintiff's criminogenics scores and defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about the abusive practices concerning his criminogenics scores.

### 2. No Violation of a Right Under the Constitution or Federal Law

After the section entitled "V. Factual Allegations," the Complaint sets out three "causes of action": "Failure to Provide Treatment"; "Overly Restrictive Conditions"; and "Denial of

Access to Legal Materials."  This section of the Complaint incorporates the various allegations in section "V. Factual Allegations," the sufficiency of which this Court addressed above. Consistent with the Court's analysis above, the Court now confines its analysis of the sufficiency of the Complaint to those allegations itemized above that survive the Court's analysis of whether the Complaint sufficiently alleged personal participation of one or more defendants.

It should be noted that, in a section entitled "II. Jurisdiction and Venue," the Complaint avers in conclusory fashion that underlying plaintiff's claims under § 1983, are alleged violations of his rights under the First, Fourth, Sixth, Eighth and Fourteenth Amendment to the United States Constitution.  Other than that conclusory statement, the Complaint largely fails to identify the alleged constitutional violations incumbent in the many complaints and allegations spelled out in the Complaint.

The Complaint avers that plaintiff's rights were deprived under the Eighth Amendment, which has historically been interpreted to protect those convicted of crimes.[57]  Any claims brought under the Eighth Amendment are dismissed, because persons subject to involuntary commitment are protected by the Fourteenth Amendment, not the Eighth Amendment.[58]  With respect to the Fourth Amendment, the Complaint alleges no facts demonstrating a violative search or seizure.  Notably, although the Complaint alleges that certain defendants "seized" plaintiff's computer, plaintiff claims a violation not from the seizure itself, but from the consequences of that seizure—a loss of educational opportunity.  The Complaint also alleges that

---

[57]*Ingraham v. Wright*, 430 U.S. 651, 664–67 (1977); *see McClendon v. City of Albuquerque*, 79 F3d 1014, 1022 (10th Cir. 1996) (noting that pretrial detainees are protected by the Due Process Clause, and convicted persons are protected by the Eighth Amendment).

[58]*Youngberg v. Romeo*, 457 U.S. 307, 311–17, 324 (1982) ("we conclude that the jury was erroneously instructed on the assumption that the proper standard of liability was that of the Eighth Amendment").

certain property was wrongfully seized, but as the Court discusses below, the Complaint fails to identify any defendants who allegedly seized the property. Thus the Court dismisses any claims under the Fourth Amendment.

The Court proceeds to address the constitutional violations apparently underlying the factual allegations that survived the threshold analysis of personal participation. These allegations are grouped, for purposes of this analysis, into five categories: (1) care, treatment and criminogenics scores; (2) telephone system; (3) law library; (4) censorship; and (5) employment and educational opportunity.

At the outset, it is incumbent upon the Court to analyze the rights that plaintiff enjoys, as a civil committee under the KSVPA. Plaintiff is not an inmate; nor is he a person who is civilly committed merely for mental health issues. Rather, plaintiff is committed, albeit civilly, upon the basis that he is a sexually violent predator from whom society needs to be protected. The Court begins its analysis, then, with a discussion of the rights of a person such as plaintiff, and of the jurisprudence that outlines factors and considerations the Court must assess in balancing the interests and rights of plaintiff with the interests of the State and the institution to which he is committed.

The KSVPA was enacted for the "potentially long-term control, care and treatment of sexually violent predators," as well as for the protection of the public.[59] "The legislature [] determine[d] that because of the nature of the mental abnormalities or personality disorders from which sexually violent predators suffer, and the dangers they present, it [was] necessary to house involuntarily committed sexually violent predators in an environment separate from persons

---

[59]K.S.A. § 59-29a01.

involuntarily committed" under other statutory schemes.[60]

Under K.S.A. § 59-29a02(a), a "sexually violent predator" is a person "who has been convicted of or charged with a sexually violent offense and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in repeat acts of sexual violence."  In other words, "the person's propensity to commit acts of sexual violence is of such a degree as to pose a menace to the health and safety or others."[61]  "Once it has been determined that a person is a sexually violent predator, he or she shall be committed to the custody of SRS for control, care, and treatment 'until such time as the person's mental abnormality or personality disorder has so changed that the person is safe to be at large.'"[62]

In upholding the KSVPA against constitutional challenge, the Supreme Court examined the conditions of confinement provided by the Act.[63]  Although sexually violent predators were to be held in a segregated unit within the prison system, the Court noted that the conditions within the unit were essentially the same as conditions for involuntarily committed persons in mental hospitals, and a secured facility was necessary because the persons confined were dangerous to the community.[64]  The confinement was not necessarily indefinite in duration because, in addition to protecting the public, the Act provided for treatment.[65]  The Court noted, however, that "under the appropriate circumstances and when accompanied by proper

---

[60]*Id.*

[61]K.S.A. § 59-29a02(c).

[62]*Johnson v. State*, 215 P.3d 575, 582 (Kan. 2009) (quoting K.S.A. § 59-29a07(a)).

[63]*See generally Kansas v. Hendricks*, 521 U.S. 346 (1997).

[64]*Seling v. Young*, 531 U.S. 250, 261 (2001) (discussing the Supreme Court's rationale and holding in *Kansas v. Hendricks* as it related to the Kansas Sexually Violent Predator Act) (internal citations omitted).

[65]*Id.* (internal citations omitted).

procedures, incapacitation may be a legitimate end of the civil law."[66]  Accordingly, even though "the Act's 'overriding concern' was the continued 'segregation of sexually violent offenders'" rather than providing curative treatment, the Court found the Act was not punitive and did not violate substantive due process.[67]

The Supreme Court has stated that "[p]ersons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."[68]  Furthermore, "due process requires that the conditions and duration of confinement under the Act bear some reasonable relation to the purpose for which persons are committed."[69]  However, for pretrial detainees, the mere "placement in a prison, subject to the institution's usual rules of conduct," which are intended to assure safety and security, does not alone signify punishment.[70]  A secure facility has a legitimate interest in "maintaining institutional security and preserving internal order and discipline," which "may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."[71]  Consequently, "[l]oss of freedom of choice and privacy are inherent incidents of confinement in such a facility."[72]  Prison administrators "should be

---

[66]*Hendricks*, 521 U.S. at 365–66.

[67]*Id.* at 366–67.

[68]*Youngberg v. Romeo*, 457 U.S. 307, 322 (1982); *Allen v. Illinois*, 478 U.S. 364 (1986).  In *Allen*, the Supreme Court noted that, had "sexually dangerous persons" been confined in conditions "essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case."  *Id.* at 373.

[69]*Seling v. Young*, 531 U.S. 250, 265 (2001) (citing *Foucha v. Louisiana*, 504 U.S. 71, 79 (1992); *Youngberg*, 457 U.S. at 324; *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)).

[70]*Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) (relying on *Bell v. Wolfish*, 441 U.S. 520 (1979)); *see United States v. Salerno*, 481 U.S. 739, 746–47 (1987).

[71]*Bell*, 441 U.S. at 546.

[72]*Id.* at 537.

accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."[73]  "In evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, . . . the proper inquiry is whether those conditions amount to punishment of the detainee."[74]

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.[75]

Similarly, when a person is found to be a sexually violent predator and is civilly committed, the conditions of his confinement must be evaluated by balancing the individual's liberty interest with the State's interest in protecting others and providing treatment.[76]  The court is also to ensure that professional judgment is exercised in determining a resident's treatment needs.[77]  The rights of sexually violent predators while in confinement may not be entirely coextensive with the rights of other pretrial detainees.[78]

---

[73]*Id.* at 547.

[74]*Id.* at 535.

[75]*Id.* at 539.

[76]*See generally Kansas v. Hendricks*, 521 U.S. 346 (1997); *see also Johnson v. Kansas*, 215 P.3d 575, 581 (Kan. 2009) (noting that, "among the justifications for indefinite restriction of an offender's liberty," may be "to ensure the provision of treatment to him or her and the protection of others who could become victims").

[77]*Youngberg v. Romeo*, 457 U.S. 307, 322 (1982).

[78]*Kelner v. Harvin*, No. 10-3127-SAC, 2010 WL 2817262, at *2 n.12 (D. Kan. July 16, 2010); *see Allison v. Snyder*, 332 F.3d 1076, 1079 (7th Cir. 2003) ("And one must keep in mind that they are pretrial detainees as well as civil committees: criminal charges against them are pending.").

Although a number of states have similar laws and procedures for the commitment of sexually violent predators, the law governing the rights of these committees is emerging. The Ninth Circuit is one of the first Circuit Courts to address the issue. In *Hydrick v. Hunter*,[79] the court noted that there are two bodies of law from which to "draw 'clearly established' law for qualified immunity purposes: first, where the SVPs claim a violation of a right that is clearly established in the prison context, and second, where the SVPs claim a violation of a right that is clearly established for all civilly detained persons."[80] The court in *Hydrick* thus concluded, and this Court agrees, that, in weighing the interests of the individual with the institution's interest in safety and treatment, "it cannot be ignored that, unlike [someone] who was civilly committed because of mental infirmities, SVPs have been adjudged to pose a danger to the health and safety of others."[81] "[T]he rights afforded prisoners set a floor for those that must be afforded SVPs."[82] If "the [d]efendants violate a standard that is clearly established in the prison context, the violation is clearly established under the SVP scheme, except where the [state] SVP statutory scheme would give a reasonable official reason to believe that the body of law applicable to prisoners would not apply."[83] Thus, as the court in *Hydrick* found, "the rights afforded civilly detained persons are flexible enough to take into account the circumstances of detention. The law generally requires a careful balancing of the rights of individuals who are detained for treatment, not punishment, against the state's interests in institutional security and the safety of

---

[79] 500 F.3d 978 (9th Cir. 2007), *rev'd on other grounds*, 129 S. Ct. 2431 (2009).

[80] *Id*. at 990.

[81] *Id*.

[82] *Id.* at 989.

[83] *Id.*

those housed at the facility."[84]

In balancing the interests of plaintiff, however, this Court is mindful that persons committed under the KSVPA are different from persons such as the plaintiff in *Youngberg v. Romeo*,[85] who was civilly committed because of mental infirmities and not based on an adjudication of sexually violent behavior that posed a danger to others. In that sense, the rights of persons such as plaintiff cannot be coextensive with civil committees like the plaintiff in *Youngberg*. There are institutional and societal interests at stake in the protection of society from the dangerous and violent behavior of persons who are committed as sexually violent predators.

Thus, in light of the purposes behind plaintiff's civil commitment in this case, the Court applies the rule that a restrictive condition may be imposed on plaintiff, similar to that imposed on pretrial or civil detainees, without being considered punishment if "it bear[s] some reasonable relation to the purpose for which persons are committed."[86] Conditions of confinement cannot give rise to a due process violation unless those conditions constitute "'atypical and significant hardship on [a resident] in relation to the ordinary incidents of [confined] life."[87]

Moreover, in evaluating treatment and other conditions and circumstances of

---

[84]*Id.* at 990 (citing *Youngberg v. Romeo*, 457 U.S. 307, 319–22 (1982)).

[85]457 U.S. 307 (1982).

[86]*Seling v. Young*, 531 U.S. 250, 265 (2001); *see Merryfield v. Jordan*, 584 F.3d 923, 925–26 (10th Cir. 2009) (affirming district court's decision to dismiss plaintiff's complaint because "none of the privations of which he complained involved a fundamental right, and he alleged no facts indicating that any restrictions are not rationally related to a legitimate governmental objective or are irrational or arbitrary").

[87]*McKune v. Lile*, 536 U.S. 24, 37 (2002) (explaining the Supreme Court's holding of *Sandin v. Conner*, 515 U.S. 472 (1995)) (alteration added); *Kelner v. Harvin*, No. 10-3127-SAC, 2010 WL 2817262, at *2 (D. Kan. July 16, 2010) (quoting *Sandin* and noting its application to sexually violent predator cases); *Merryfield v. Schearrer*, No. 07-3288-SAC, 2008 WL 4427656, at *5 n.18 (D. Kan. Sept. 25, 2008).

confinement, the Court employs the "professional judgment"standard, required in the context of those civilly committed for mental health reasons by the Supreme Court in *Youngberg*.[88]  In so doing, the Court balances the individual's interests and the State's interests to insure that there is minimal interference with the internal operations of the State's institution, by considering any decision by a professional of that institution to be "presumptively valid,"[89] rendering violative only those decisions that are "a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."[90]

The Court now turns its analysis to the specific claims.

a.       **Care, Treatment and Criminogenics Scores**

The Complaint alleges that defendants Brous, DesLauriers and Strong have failed to provide care and treatment by failing to have sufficient contact with plaintiff, and that defendants DesLauriers, Strong and Applequist have failed to provide care and treatment by failing to give plaintiff credit for his prior treatment experience despite acknowledging that plaintiff should receive such credit.  The Complaint also alleges that plaintiff has never been seen by defendant Brous, his "primary therapist," yet also alleges that defendant Applequist is plaintiff's primary therapist and that plaintiff's "assigned therapist has a neglectful rapport with the plaintiff which provides no basis for trust between him and the therapist."  The Complaint further alleges that plaintiff has had little access to the psychiatrists because of their case load and that plaintiff's trust and rapport with them is "very low, partly because of defendants[']

---

[88]*Youngberg*, 457 U.S. at 322.

[89]*Id*. at 323 (citation omitted).

[90]*Id.*

persistent disciplinary actions, and destruction of his personal property." The Complaint also alleges that the defendants have failed to consider or credit plaintiff for treatment he received from the Kansas Department of Corrections during the thirteen years he was incarcerated.

Related to his allegations about inadequate treatment are plaintiff's allegations that various defendants punished him by abusive and improper use of a therapeutic tool known as the criminogenics assessment.[91] Specifically, the Complaint alleges that defendants Applequist, Gray and Riedel have wrongfully assessed plaintiff's criminogenics scores, including failing to accord plaintiff the required procedure and process of a 90-day assessment period. The Complaint also alleges that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about the abusive practices concerning his criminogenics scores.

Although the Complaint can be read to primarily allege a violation of plaintiff's right to substantive due process, the allegations concerning the failure to abide by the procedure for a 90-day review process prompt the Court to analyze this claim under both the procedural due process and substantive due process components of the Fourteenth Amendment. As more fully discussed below, the Complaint fails to state a claim under the Fourteenth Amendment, because it fails to allege facts showing a denial or deprivation of a fundamental right or liberty.

Substantive due process has two strands.[92] First, it prevents the government from interfering with certain fundamental rights "deeply rooted in this Nation's history and tradition"

---

[91]*See* Black's Law Dictionary (9th ed. 2009) (defining "criminogenic" as an adjective, indicating a tendency "to cause crime or criminality").

[92]*Seegmiller v. Laverkin City*, 528 F.3d 762, 767 (10th Cir. 2008).

and "implicit in the concept or ordered liberty."[93]  Second, it prevents the government from engaging in conduct that is so egregious that it "shocks the conscience," even though it does not implicate any fundamental rights.[94]  These strands are not mutually exclusive, and by satisfying either, a plaintiff states a valid substantive due process claim.[95]

Among the fundamental rights protected by the Clause are the freedoms enumerated in the Bill of Rights and certain other liberty and privacy interests implicit within due process.[96] The Fourteenth Amendment forbids the government from infringing on fundamental interests unless the regulation is narrowly tailored to serve a compelling State interest.[97]

In the prison context, a regulation impinging an inmate's fundamental rights is valid if it is "reasonably related to legitimate penological interests" and is not an exaggerated response to those concerns.[98]  Furthermore, in the absence of a fundamental right, "the state may regulate an interest pursuant to a validly enacted state law or regulation rationally related to a legitimate state interest."[99]  "Conduct that shocks the judicial conscience, on the other hand, is deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'"[100]  This strand prevents the government from abusing its power.[101]

---

[93]*Id.*

[94]*Id.*

[95]*Id.* at 767, 769.

[96]*Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997).

[97]*Seegmiller*, 528 F.3d at 767.

[98]*Turner v. Safley*, 482 U.S. 78, 89 (1987) (providing a four-part test to measure reasonableness).

[99]*Seegmiller*, 528 F.3d at 771 (citing *Reno v. Flores*, 507 U.S. 292, 305 (1993)).

[100]*Id.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 840 (1998)).

[101]*Id.* (quoting *Lewis*, 523 U.S. at 840)).

"Not all governmental conduct is covered, however, as 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'"[102]

Given that plaintiff is confined pursuant to civil commitment under the KSVPA, the Court evaluates his substantive due process challenge to his treatment by determining: (1) whether with respect to the complained of State action, there is a purpose that is reasonably related to the purposes of plaintiff's confinement, *i.e.*, to protect the health and safety of the community while providing therapeutic resources for plaintiff;[103] and (2) whether the action is based on a decision by a professional that is entitled to presumptive validity because the decision is not a substantial departure from accepted professional judgment, practice or standards.[104]

With these standards in mind, the Court concludes that the Complaint fails to state a claim that plaintiff was denied substantive due process. There is no liberty interest in receiving the "best available and most qualified treatment," or treatment that will ensure a resident's release.[105] Generally, "a State is under no constitutional duty to provide substantive services for those within its border."[106] Plaintiff cites various state statutory and constitutional provisions, and quotes the Congressional findings in the Protection and Advocacy for Mentally Ill Individuals Act of 1986 ("PAMIIA").[107] However, § 1983 was not intended to redress violations

---

[102]*Id.*

[103]*Seling v. Young*, 531 U.S. 250, 265 (2001); *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982).

[104]*Youngberg*, 457 U.S. at 323.

[105]*Cf. Kansas v. Hendricks*, 521 U.S. 346, 366 (1997) (noting that, in the absence of recovery, continued confinement may be appropriate); *Youngberg*, 457 U.S. at 317 (setting forth the standard for evaluating the appropriate training and treatment required by the Constitution).

[106]*Youngberg*, 457 U.S. at 317.

[107]42 U.S.C. § 10801.

of state law or administrative regulation,[108] and plaintiff does not identify what federal right he believes was violated under the PAMIIA[109]

When a person is civilly committed and entirely dependent upon the State, the State has a duty to provide adequate food, shelter, clothing and medical care, reasonably safe conditions, freedom from bodily restraint, and "minimally adequate or reasonable training to ensure safety and freedom from undue restraint."[110]  The Complaint alleges that plaintiff has in fact been receiving medical treatment: he has undergone therapy with defendant Applequist; he receives regular 90-day reviews and criminogenics assessments completed by staff from three departments (therapy staff, activity therapy staff, and nursing staff), which evaluate sixteen categories of plaintiff's behavior; he attends classes with other residents; and, under certain conditions, he participated in the Vocational Training Program, designed to develop job skills. Notably, the Complaint also alleges facts that are internally inconsistent.  On the one hand, the Complaint alleges that plaintiff has not spent time with his primary therapist; on the other hand it alleges that he and his primary therapist have a negative rapport; and it identifies two defendants as his primary therapist.

Plaintiff's primary complaint, however, is that his treatment is inadequate to ensure his

---

[108]*Gaines v. Stenseng*, 292 F.3d 1222, 1225 (10th Cir. 2002); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 (1970).

[109]*See Ind. Prot. & Advocacy Servs. v. Ind. Family & Soc. Servs. Admis.*, 603 F.3d 365, 375, 380 (7th Cir. 2010) (noting that "Congress wanted to establish a protection and advocacy system that would protect and advocate for the rights of individuals with mental illness and investigate incidents of abuse and neglect of those individuals"); *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 994–95 (1st Cir. 1992) (holding that the Restatement of Bill of Rights for Mental Health Patients, 42 U.S.C. § 10841 *et seq.*, did not create enforceable federal rights); *McAlpine v. McAlpine*, No. 10-CV-0048-CVE-TLW, 2010 WL 474643, at *3 (N.D. Okla. Feb. 2, 2010); *see also Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002) ("[T]o seek redress through 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*.") (emphasis in original).

[110]*Youngberg*, 457 U.S. at 315–16, 319, 324; *see* K.S.A. § 59-29a09 ("The involuntary detention or commitment of persons under this act shall conform to constitutional requirements for care and treatment.").

eventual release. Such treatment is not guaranteed under the Constitution. The Supreme Court has held that a sexually violent predator's involuntary commitment may be necessary even if, in the absence of recovery, commitment has the potential to become indefinite:

> While we have upheld state civil commitment statutes that aim both to incapacitate and to treat, we have never held that the Constitution prevents a State from civilly detaining those for whom no treatment is available, but who nevertheless pose a danger to others. . . . To conclude otherwise would obligate a State to release certain confined individuals who were both mentally ill and dangerous simply because they could not be successfully treated for their afflictions.[111]

Moreover, as defendants note, successful completion of the program is not the sole means by which a resident may achieve release: the statute provides that plaintiff is to be re-examined once every year.[112] The Secretary of SRS may determine the individual's condition is so changed that release is warranted,[113] or the person may petition for his transitional release without the Secretary's approval.[114]

In any event, the Court's role is not to exercise or supplant its own professional judgment. Rather, the Court must ensure that professional judgment in fact was exercised,[115] and if so, then "decisions made by the appropriate professional are entitled to a presumption of correctness."[116] The Supreme Court has advised that "interference by the federal judiciary with

---

[111]*Kansas v. Hendricks*, 521 U.S. 346, 366 (1997) (internal citations omitted).

[112]K.S.A. § 59-29a08(a).

[113]*Id.* § 59-29a10.

[114]*Id.* § 59-29a11.

[115]*Youngberg*, 457 U.S. at 324.

[116]*Id.*

the internal operations of these institutions should be minimized."[117]  Liability is imposed only if "the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."[118]  A professional will not be held liable in his individual capacity "if he was unable to satisfy his normal professional standards because of budgetary constraints; in such a situation, good-faith immunity would bar liability."[119]

    As defendants argue, all of the claims relate directly to their exercise of professional judgment, albeit professional judgment that plaintiff disagrees with, discounts or distrusts.  The Complaint makes the conclusory allegation that his treatment-providers are not "trained, qualified, certified or licensed to provide meaningful treatment to 'sexually violent predators.'"  The Supreme Court defines a "professional" decisionmaker as "a person competent, whether by education, training or experience, to make the particular decision at issue."[120]  The Complaint does not allege that plaintiff's treatment-providers lack training and experience in the field.  Rather, the allegations indicate that professional judgment has been exercised in his care and treatment: among his defendants are a program clinical director, program administrative director,

---

[117]*Id.* at 322.

[118]*Id.* at 323.

[119]*Id.*

[120]*Id.* at 323 n.30.  The Court noted that long-term treatment decisions should be made,

>    by persons with degrees in medicine or nursing, or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.  Of course, day-to-day decisions regarding care–including decisions that must be made without delay–necessarily will be made in many instances by employees without formal training but who are subject to the supervision of qualified persons.

*Id.*

supervising psychologist, primary therapist, clinical social worker supervisor, program consultant, and activity therapist, all of whom allegedly work in the SPTP.

In short, the Complaint simply fails to provide sufficient detail to overcome the presumptive validity of the obviously professional nature of judgments regarding the nature, type and scope of plaintiff's treatment plan, including whether there are specific goals for release; whether plaintiff is given "credit" for therapy he received while in prison; what classes plaintiff is required to take and whether he is required to repeat such classes; the time plaintiff spends with various members of his treatment team, including the psychiatrist, licensed clinical psychologist and other therapists; whether plaintiff has developed sufficient trust and rapport with his medical providers; and whether such treatment is "meaningful to sexually violent predators." Furthermore, the allegations regarding the qualifications of staff in the SPTP are not supported by facts. Nor is there any plausible allegation that plaintiff is entitled under the KSVPA to staff with certain professionals, nor any allegation as to how the qualifications of staff are deficient.

The Complaint, in failing to allege facts that, if true, would demonstrate a substantial departure from accepted professional judgment or practice, fails to state a claim for deprivation of, or interference with, a liberty interest. Thus, the Complaint fails to state a claim for violation of substantive due process with respect to the cause of action for failure to provide treatment.

The Complaint also alleges that plaintiff was denied procedural due process, in that he was evaluated and assessed with a criminogenics score that was the product of a faulty, or inadequate or retaliatory process. For example, plaintiff alleges that at one point he was given a score based on a review period of less than 90 days, and by therapists that either had insufficient contact with him, or who assessed scores tainted by their own animosity toward him.

Procedural due process claims are examined in two steps: "the first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."[121]  "The types of interest that constitute 'liberty' and 'property' for Fourteenth Amendment purposes are not unlimited; the interest must rise to more than 'an abstract need or desire,' and must be based on more than 'a unilateral hope.'"[122]  "Rather, an individual claiming a protected interest must have a legitimate claim of entitlement to it.  Protected liberty interests 'may arise from two sources—the Due Process Clause itself and the laws of the States.'"[123]

The Complaint wholly fails to state a claim of procedural due process, for it fails to allege facts demonstrating that plaintiff had a liberty or property interest associated with his criminogenics score, or his security level, for that matter.  Generally, a challenge to a classification decision does not state an actionable constitutional claim.[124]  A behavior treatment program such as plaintiff has described, which is intended to modify behavior, treat plaintiff, and protect other SPTP residents, is rationally related to those institutional objectives, and therefore, is not "punishment" under the Due Process Clause.[125]  Furthermore, the Complaint does not identify any fundamental rights that were affected by the reduction in plaintiff's security level.

---

[121]*Ky. Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989) (internal citation omitted).

[122]*Id.* (internal citations omitted).

[123]*Id.* (quoting *Hewitt v. Helms*, 459 U.S. 460, 466 (1983)).

[124]*See McKune v. Lile*, 536 U.S. 24, 39 (2002); *Lile v. Simmons*, 143 F. Supp. 2d 1267, 1273 (D. Kan. 2001); *see also Sparks v. Foster*, 241 F. App'x 467, 471 (10th Cir. 2007); *Lile v. McKune*, 224 F.3d 1175, 1185 (10th Cir. 2000).

[125]*See McKune v. Lile*, 536 U.S. at 39–40, 38 ("A prison clinical rehabilitation program, which is acknowledged to bear a rational relation to a legitimate penological objective, does not violate the privilege against self-incrimination if the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute atypical and significant hardships in relation to the ordinary incidents of prison life.").

Plaintiff does not have a liberty interest in being at a particular phase level of the SPTP.[126] Because there is no liberty or property interest at stake, plaintiff has no basis for a procedural due process challenge. Moreover, plaintiff admits he was notified of his phase level reduction and was given the opportunity to appeal that decision twice.

Although the Complaint alleges that defendants DesLauriers, Strong, Applequist, Gray and Riedel gave plaintiff criminogenics scores that were false, malicious and retaliatory and further ignored plaintiff's complaints about the nursing staff giving him low scores, the Complaint fails to allege facts supporting the conclusory allegation that the scores were wrong, or the product of abuse or retaliation rather than the product of professional judgment.

In short, whether the Court construes plaintiff's claim as procedural or substantive, the facts alleged in the Complaint fail to show a violation of a federal or constitutional right, or a violation or deprivation of a liberty interest created by the Due Process Clause or state law.

b.    Telephone System

The Complaint alleges that plaintiff has been denied the right to private telephone calls due to the close proximity of the telephones, and that his complaints about this to defendants DesLauriers, Flamik, Strong, Applequist, Gray and Fiedel went unanswered. The constitutional right to privacy depends on whether the person claiming its protection has a legitimate expectation of privacy that society is prepared to recognize as reasonable.[127] In the prison context, the Supreme Court held:

> Determining whether an expectation of privacy is "legitimate" or

---

[126]S*ee Williams v. DesLauriers*, 172 P.3d 42, 48 (Kan. Ct. App. 2007) (holding that a resident's status and privileges are conditioned on compliance with the rules and policies of the SPTP, and there is no protected liberty interest in being on a particular phase level of the SPTP).

[127]*United States v. Johnson*, 584 F.3d 995, 999 (10th Cir. 2009).

"reasonable" necessarily entails a balancing of interests. The two interests here are the interest of society in the security of its penal institutions and the interest of the prisoner in privacy within his cell. The latter interest, of course, is already limited by the exigencies of the circumstances: A prison "shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room." We strike the balance in favor of institutional security, which we have noted is "central to all other corrections goals." A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security. We believe that it is accepted by our society that "[l]oss of freedom of choice and privacy are inherent incidents of confinement."[128]

Although plaintiff is not an inmate, he is housed in an institution that has an express interest in the security of persons inside and outside of the facility. "A detainee simply does not possess the full range or freedoms of an unincarcerated individual."[129] Although plaintiff cites K.S.A. § 59-29a22(b)(16) as support, defendants note that this statute only gives residents the right to "[r]easonable access to a telephone to make and receive telephone calls within reasonable limits." The phone policy appears to have a reasonable relation to legitimate institutional objectives and is not excessive to that purpose. The SPTP has "legitimate treatment goals related to the discipline and behavior modification and the treatment of patients committed to the SPTP."[130] And, plaintiff has not alleged circumstances resulting in atypical or significant hardship beyond the normal incidents of life within the SPTP.

---

[128]*Hudson v. Palmer*, 468 U.S. 517, 527–28 (1984) (internal citations omitted).

[129]*Bell v. Wolfish*, 441 U.S. 520, 546 (1979).

[130]*See Williams v. DesLauriers*, 172 P.3d 42, 49 (Kan. Ct. App. 2007) (rejecting plaintiff's constitutional due process challenge to the "lack of a formal disciplinary procedure" in the SPTP and various policies).

"The Fourteenth Amendment's Due Process Clause protects individuals from state intrusion into fundamental aspects of their personal privacy," such as avoiding the disclosure of personal matters.[131] However, only certain information is given such protection.[132] The Complaint alleges that the message provided to the public via incoming calls did not reveal any of his personal medical information.[133] And, the Complaint fails to allege facts showing that plaintiff had a reasonable expectation of privacy in the kind of unmonitored telephone calls he is requesting.[134] Indeed, residents were given notice in November 2008, that the institution was changing from phones on each unit that could receive and send calls, to two pay phones for outgoing calls and two phones for incoming calls that had a pre-recorded message advising the caller that their call was incoming to a "secured facility." Thus, the Complaint simply fails to allege facts showing a violation of any constitutional right, or right under federal law, and thus fails to state a claim.

### c.     Law Library

The Complaint alleges that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel failed to respond to plaintiff's complaints about the inadequacy of the library. The Complaint alleges that while plaintiff has access to a law library, the available materials are inadequate: one set of Kansas Statutes Annotated; one set of Kansas Administrative Regulations, Volumes 1 through 7; one set of Session Laws, Volumes 1 and 2; and the legal research engine

---

[131]*Stidham v. Peace Officer Standards & Training*, 265 F.3d 1144, 1155 (10th Cir. 2001).

[132]*Id.* (noting that it must be information in which the party has a "reasonable expectation of privacy").

[133]*See* K.S.A. § 59-29a22(10) (noting merely that patients have the right to "confidentiality of all treatment records").

[134]*See, e.g., Semler v. Ludeman*, No. 09-0732 ADM/SRN, 2010 WL 145275, at *16 (D. Minn. Jan. 8, 2010) (collecting cases upholding restrictions on inmates' telephone use).

LexisNexis.  The Complaint further alleges that there is no trained librarian or staff person available to help research, answer questions, or verify the availability of resources, no reference materials or updating services, and residents are not allowed to check out materials.

Although there is a constitutional right of access to the courts, there is no "abstract, freestanding right to a law library or legal assistance."[135]  Law libraries and legal assistance programs are only "means for ensuring 'a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts.'"[136]  In the prison context, in asserting a claim for denial of the right of access to the courts, "an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense . . . the inmate [] must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim."[137]  To state a claim, plaintiff "must show that any denial or delay of access to the court prejudiced him in pursuing litigation."[138]

Even if those involuntarily committed under the KSVPA enjoy a broader Sixth Amendment right than do inmates, the Complaint fails to allege that plaintiff has suffered some actual injury or prejudice.  In that respect, the Complaint fails to state a claim for a violation of the Sixth Amendment for lack of access to the courts based on inadequate legal resources.  In fact, the length and comprehensive scope of this Complaint, a thirty-nine page pleading with eighty-eight pages of exhibits, as well as the comprehensive analysis in plaintiff's responsive

---

[135]*Lewis v. Casey*, 518 U.S. 343, 351 (1996).

[136]*Id.*

[137]*Id.*

[138]*Trujillo v. Williams*, 465 F.3d 1210, 1226 (10th Cir. 2006).

pleadings to the motions to dismiss, evidence that plaintiff has more than adequate access to common law, statutory law and constitutional law resources, sufficient to frame a complaint under § 1983 for multiple constitutional violations based on numerous instances of allegedly egregious and injurious conduct by State actors.  Accordingly, the Complaint fails to state a claim based on the Sixth Amendment.  Because there are no allegations of actual injury, plaintiff's First Amendment claim fails on this basis as well.

Moreover, the Complaint fails to state a claim under the Fourteenth Amendment for violation of due process on this basis.  The allegations about the quantity and quality of reference materials and research support do not rise to the level of a due process violation, for the complained of inadequacies do not present an "'atypical and significant hardship on [a resident] in relation to the ordinary incidents of [confined] life.'"[139]  Moreover, employing the "professional judgment" standard used in the context of those civilly committed for mental health reasons, the Court finds that the subscriptions and staffing of the library are the product of the institution's professional judgment, which the Court finds valid, as plaintiff alleges no facts that would show "a substantial departure from accepted professional judgment, practice, or standards."[140]

### d.    Censorship

The Complaint alleges that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about censorship, and his being

---

[139]*McKune v. Lile*, 536 U.S. 24, 37 (2002) (explaining the Supreme Court's holding of *Sandin v. Conner*, 515 U.S. 472 (1995)) (alteration added); *Kelner v. Harvin*, No. 10-3127-SAC, 2010 WL 2817262, at *2 (D. Kan. July 16, 2010) (quoting *Sandin* and noting its application to sexually violent predator cases); *Merryfield v. Schearrer*, No. 07-3288-SAC, 2008 WL 4427656, at *5 n.18 (D. Kan. Sept. 25, 2008).

[140]*Youngberg v. Romeo*, 457 U.S. 307, 323 (1982).

precluded from possessing a JC Penney catalog and a movie, and from purchasing local newspapers. The Complaint alleges that these and other defendants took a JC Penney catalog from him. Plaintiff offered to remove the children's section and the lingerie section from the catalog, but his offer was refused. Also, plaintiff's room was searched and defendants seized a movie titled "Luster," that contained "brief" nudity and sexual themes. Allegedly, this movie had previously been on an approved list, but the treatment team changed the policy. Further, plaintiff is barred from purchasing local newspapers. The Court construes this as a substantive due process claim, as the Complaint does not appear to complain about any procedural process or protections.[141]

Civil confinement, like imprisonment, does not automatically strip a person of his First Amendment rights; however, "the Constitution sometimes permits greater restriction of such rights in a prison than it would allow elsewhere."[142] "[T]he judiciary is 'ill equipped' to deal with the difficult and deliberate problems" of managing persons in confinement, and therefore, it must "afford[] considerable deference to the determination of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world."[143] The Supreme Court has held that restrictive regulations are permissible so long as they are "reasonably related to legitimate penological interests"[144] and are not an exaggerated response to those objectives.[145] "This is true even when the constitutional right claimed to have been

---

[141]*See United States v. Deters*, 143 F.3d 577, 582 (10th Cir. 1998) ("The defendant does not complain of a lack of procedure; thus, she does not implicate the procedural component of the Due Process Clause.").

[142]*Beard v. Banks*, 548 U.S. 521, 528 (2006).

[143]*Thornburgh v. Abbott*, 490 U.S. 401, 407–08 (1989).

[144]*Turner v. Safley*, 482 U.S. 78, 89 (1987).

[145]*Beard*, 548 U.S. at 528.

infringed is fundamental."[146]

Courts have generally upheld bans on the right of sexually violent predators to possess sexually explicit materials.[147]  The SPTP has a legitimate treatment interest in restricting "publications depicting nudity, or pictures of children in general."[148]  Here, any ban on sexually explicit material is reasonably related to institutional and therapeutic interests in the treatment of sexually violent predators and security within the facility.[149]  The primary purpose behind the SPTP is to provide "potentially long-term control, care and treatment [for] sexually violent predators," as well as provide "protection [for] the public."[150]  Plaintiff alleges that he is a "sexually violent predator," therefore, the purposes of the program are intended for his treatment and safety as well.  Defendants' policy limiting plaintiff's access to a particular clothing catalogue or local newspapers—which regularly contain images of young children or advertisements for underclothing—is reasonably related to the program's interest in treatment

---

[146]*Washington v. Harper*, 494 U.S. 210, 223 (1990).

[147]*See Gilmore v. State of Kan.*, No. 03-3222-JAR, 2004 WL 2203458, at *5 (D. Kan. Sept. 27, 2004) ("Any magazines or publications that contain material describing or depicting sexual or erotic material, pornography, violence, rape, nude women, men and children, or depictions of men, women or children in suggestive situations, or pictures of children in general, may be proscribed by SPT Program due to legitimate treatment interests."); *see also Marten v. Henry*, No. C09-5733RBL/JRC, 2010 WL 2650547, at *3–*4 (W.D. Wash. June 2, 2010) ("Several reported cases consistently have ruled that prisoners do not have a constitutional right to view sexually oriented material.") (citing *Jewell v. Gonzales*, 420 F. Supp. 2d 406, 438 (W.D. Penn. 2006); *Waterman v. Farmer*, 183 F.3d 208 (3d Cir. 1999)); *Fox v. Richards*, No. C06-5063 RBL/KLS, 2007 WL 1031720, at *3–*4 (W.D. Wash. Apr. 3, 2007) (noting that a First Amendment challenge to policies in a program for sexually violent predators must be analyzed in terms of the legitimate polices and goals of the Sexually Violent Predator Program).

[148](Doc. 126 at 16.)

[149]*Jones v. Salt Lake County*, 503 F.3d 1147, 1155–56 (10th Cir. 2007) (upholding prison ban on sexually explicit material); *Williams v. DesLauriers*, 172 P.3d 42, 48–49 (Kan. Ct. App. 2007) (holding that SPTP had a legitimate treatment and security interest in seizing sexually explicit material); *see Sperry v. Werholtz*, No. 04-3125-CM, 2010 WL 1980305, *9–*10 (D. Kan. May 18, 2010) (holding that Fourth Amendment claim of inmate based on seizure of sexually explicit material fails).

[150]*Johnson v. State of Kan.*, 215 P.3d 575, 650–51 (Kan. 2009).

for its residents, institutional security, and safety for the surrounding community.[151]  Plaintiff

does not argue that he has been denied access to other news sources or alternative catalogues.

For these reasons as well, plaintiff's allegations fail to state a claim under § 1983 that rise to the

level of a violation of a federal or constitutional right.

### e. Denial of Educational and Employment Opportunities

The Complaint alleges that plaintiff was denied an educational opportunity.  Plaintiff

requested permission from the treatment team to take a home study correspondence course in

flight training to enhance his employment potential, and his family agreed to finance the course.

But plaintiff's computer was subsequently seized by defendants  DesLauriers, Flamik, Strong,

Applequist, Gray and Riedel, such that plaintiff was unable to continue his course.  Plaintiff asks

the Court to construe this claim as a violation of his "liberty interest" in the combined right to his

computer and the correspondence course located on his computer, for which due process was

denied.  Construing plaintiff's allegations liberally, the Court considers its substantive and

procedural components.

Participation in a vocational training program while involuntarily confined is a privilege,

not a right guaranteed by the federal constitution.[152]  In the prison context, prisoners generally

have no constitutional right to educational opportunities while incarcerated,[153] and education is

---

[151]*See id.*

[152]*See Sandin v. Conner,* 515 U.S. 472, 485-86 (1995).

[153]*Joseph v. U.S. Fed. Bureau of Prisons*, 232 F.3d 901 (Table), 2000 WL 1532783, at *2–*3 (10th Cir. Oct. 16, 2000) (citing *Wishon v. Gammon*, 978 F.2d 446, 450 (8th Cir. 1992); *Templeman v. Gunter*, 16 F.3d 367, 370 (10th Cir. 1994)); *Robinson v. Smith*, 982 F.2d 529 (Table), 1992 WL 367990, at *1 (10th Cir. Dec. 9, 1992) ("This circuit has never determined that prisoners enjoy an entitlement to educational or rehabilitation services, only to an environment non-threatening to mental and physical well-being.  A limitation on educational privilege, particularly to further a legitimate concern such as articulated by the penal institution here, is not a denial of a federally-guaranteed right.") (internal citation omitted).

not considered a fundamental right protected by the Constitution.[154]  Plaintiff does not claim he was altogether denied the right to educational materials; rather, he claims his flight training course was interrupted by seizure of his computer.[155]  But he cites no authority for a property or liberty interest created out of associated interests such as these.  To the extent plaintiff is alleging a procedural due process claim, plaintiff has not further identified any statute giving him a protected interest in the education programs he describes.[156]

The Complaint also alleges that defendants DesLauriers, Flamik, Strong, Applequist, Gray and Riedel have failed to respond to plaintiff's complaints about denial of meaningful employment.  The Complaint alleges that plaintiff had been employed in the dietary department as part of the Vocational Training Program.  But, after receiving two disciplinary reports unrelated to his employment that reduced his security level, plaintiff's position was terminated when he was moved to a different residential building.  Plaintiff reapplied for a dietary position, but was denied.  Plaintiff complained to DesLauriers, Flamik, Strong, Applequist, Gray and Riedel, but they have taken no remedial action.  The Court construes this claim as substantive and procedural.

As previously discussed, in the prison context, participation in a vocational training or employment program is a privilege, not a right guaranteed by the federal Constitution.[157]

---

[154]*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973).

[155]*See Mower v. Swyhart*, 545 F.2d 103, 104 (10th Cir. 1976) (holding that the right to receive educational materials was not "irrevocably lost," when there was a Bureau of Prison policy that inmates receive prior approval and authorization before receiving educational material in the mail).

[156]*Gross v. Lopez*, 419 U.S. 565, 572–73 (1975) (looking to state law to determine whether appellees had a legitimate claim of entitlement to public education); *Stansbury v. Hannigan*, 960 P.2d 227, 238 (Kan. 1998).

[157]*Sandin v. Conner*, 515 U.S. 472, 485–86 (1995).

Because plaintiff does not have a property or liberty interest in his job,[158] he has not alleged a violation of constitutional or federal law. Even if plaintiff had a property or liberty interest at stake, the Complaint fails to overcome the presumptive validity of the professional judgment exercised by those administering the vocational programming in the institution. Moreover, to the extent plaintiff's claim is based on procedural due process, Kansas at-will employment does not give him a protected property interest in his employment either.[159] Therefore, the Complaint does not state a substantive or procedural due process claim.

### 3. Qualified Immunity

"The doctrine of qualified immunity protects government officials "'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"[160] "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."[161] The doctrine "is designed not only to shield public officials from liability, but also to ensure that erroneous suits do not even go to

[158]*Penrod v. Zavaras*, 94 F.3d 1399, 1407 (10th Cir. 1996) (*per curiam*) ("prison regulations entitling prisoners to work do not create a constitutional liberty interest because a denial of employment opportunities to an inmate does not impose an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life'" (citation omitted)); *Templeman v. Gunter*, 16 F.3d 367, 370 (10th Cir. 1994); *Ingram v. Papalia*, 804 F.2d 595, 596–97 (10th Cir. 1986) ("The Constitution does not create a property or liberty interest in prison employment.").

[159]*Crowley v. City of Burlingame*, 352 F. Supp. 2d 1176, 1181 (D. Kan. 2005) ("An employee-at-will has no property interest in continued employment.") (quoting *Moorhouse v. City of Wichita*, 913 P.2d 172, 180 (Kan. 1996)); *see Farthing v. City of Shawnee, Kan.*, 39 F.3d 1131, 1136 (10th Cir. 1994) ("In the absence of any evidence to the contrary, a public employee terminable at-will does not possess a protected property interest under Kansas law for purposes of procedural due process analysis," and therefore procedural due process safeguards are inapplicable).

[160]*Pearson v. Callahan*, —U.S.—, 129 S. Ct. 808, 815 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[161]*Id.*

trial."[162]

Once defendant pleads the defense of qualified immunity, plaintiff bears the burden of establishing that defendant's conduct (1) violated a federal constitutional or statutory right (2) that was clearly established at the time of the conduct at issue.[163]  Under the second prong, a plaintiff can demonstrate that a right is clearly established—such that, at the time of the violation, "a reasonable official would understand that what he [was] doing violates that right"—by "references to cases from the Supreme Court, the Tenth Circuit, or the weight of authority from other circuits."[164]

Because the Complaint fails to allege facts that show a violation of plaintiff's statutory or constitutional rights, the defendants are entitled to qualified immunity, as the Complaint fails to establish that any of the defendants violated clearly established rights.

### C.      State Law Claims

Within plaintiff's three causes of action, he briefly cites to the Kansas Bill of Rights and K.S.A. § 59-29a09, without elaboration.  Under 28 U.S.C. § 1367(c), the Court may decline to exercise supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction."[165]  The Court considers "the nature and extent of pretrial proceedings, judicial

---

[162]*Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 780 (10th Cir. 1993).

[163]*Briggs v. Johnson*, 274 F. App'x 730, 733 (10th Cir. 2008); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1255 (10th Cir. 1998) (citing *Clanton v. Cooper*, 129 F.3d 1147, 1153 (10th Cir. 1997)); *Albright v. Rodriquez*, 51 F.3d 1531, 1534 (10th Cir. 1995).

[164]*Christensen v. Park City Mun. Corp.*, 554 F.3d 1271, 1278 (10th Cir. 2009).

[165]28 U.S.C. § 1367(c)(3); *see Estate of Harshman v. Jackson Hole Mountain Resort*, 379 F.3d 1161, 1164 (10th Cir. 2004) ("Seeking to vindicate values of economy, convenience, fairness, and comity underlying the judicially-created doctrine of pendent jurisdiction, Congress granted statutory authority to district courts to hear claims that form 'part of the same case or controversy' as the claims on which original federal jurisdiction is based.").

economy, convenience, and [whether] fairness would be served by retaining jurisdiction."[166] Because all of plaintiff's federal claims have been dismissed at an early stage of these proceedings, the Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.[167]

### D.     No Leave to Amend

Plaintiff has neither filed a motion requesting leave to amend the Complaint nor given reason why he failed to cure pleading deficiencies when he filed his Amended Complaint. Further, he gives no indication that he knows of additional facts to support his claims. "[A] *pro se* litigant bringing suit *in forma pauperis* is entitled to notice and an opportunity to amend the complaint to overcome any deficiency unless it is clear that no amendment can cure the defect."[168] Leave need not be granted if amendment would be futile.[169]

Although defendants' motion has put plaintiff on notice of the deficiencies in his pleading, plaintiff has given this Court no indication that he knows of additional facts to support his claims.[170] Based on the foregoing discussion, which dismissed plaintiff's claims for lack of jurisdiction, failure to state a claim, and qualified immunity, any possible amendment would be

---

[166]*Anglemyer v. Hamilton County Hosp.*, 58 F.3d 533, 541 (10th Cir.1995) (quoting *Thatcher Enter. v. Cache County Corp.*, 902 F.2d 1472, 1478 (10th Cir. 1990)).

[167]*Smith v. City of Enid*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

[168]*Denton v. Hernandez*, 504 U.S. 25, 34 (1992).

[169]*See Gee v. Pacheco*, —F.3d—, 2010 WL 4196034, at *14 (10th Cir. 2010); *Mountain View Pharmacy v. Abbott Labs.*, 630 F.2d 1383, 1389 (10th Cir.1980) ("Where a complaint, as amended, would be subject to dismissal, leave to amend need not be granted.").

[170]*See Hall v. Witteman*, 584 F.3d 859, 867 (10th Cir. 2009).

futile.[171]

## IV.    Conclusion

Defendants Shutter, Herman, Paige, Smith, Thompson, Turner and Hagerman are dismissed because they are not named as party defendants in the First Amended Complaint.  The official capacity claims for monetary damages are dismissed because such claims are barred by the Eleventh Amendment.  The remaining individual and official capacity claims are dismissed because: (1) the Complaint fails to allege facts demonstrating personal participation by the named defendants; (2) the Eighth Amendment does not apply to persons who are involuntarily committed under the civil procedures of the KSVPA; (3) the Complaint fails to allege a violation directly from a search or seizure; (4) the Complaint fails to allege facts implicating a protected liberty or privacy interest, a fundamental right, or other protected right or interest that was violated, nor conduct that shocks the conscience, such that it would demonstrate a violation of the substantive due process or procedural due process components of the Fourteenth Amendment; (5) the Complaint fails to allege facts showing denial of a right under the Sixth Amendment, nor any actual injury or prejudice flowing from a violation of the Sixth Amendment; (6) the Complaint fails to allege facts showing State action that was not reasonably related to institutional or therapeutic interests; and/or (7) the Complaint fails to allege facts showing State action that was not the product of professional judgment.  Finally, because the Complaint fails to show a violation of a right under the Constitution or federal law, much less a violation of a "clearly established" right, the defendants are entitled to qualified immunity as

---

[171]*See Curley v. Perry*, 246 F.3d 1278, 1281–82 (10th Cir. 2001) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *Calderon v. Kan. Dep's of Soc. & Rehabilitation Servs.*, 181 F.3d 1180, 1186–87 (10th Cir. 1999) (noting that a court is generally not required to grant a plaintiff leave to amend where there is no motion requesting leave or setting forth grounds for the amendment); *Jones v. Barry*, 33 F. App'x 967, 970–71 (10th Cir. 2002).

against the individual capacity claims.  The Court declines to exercise supplemental jurisdiction over plaintiff's state law claims.  Any amendment to the Complaint would be futile.

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' Motions to Dismiss (Docs. 125 and 153) are **GRANTED**.  Plaintiff's claims are dismissed in their entirety with prejudice.

**IT IS SO ORDERED.**

Dated: December 22, 2010

 S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE